110 So.2d 123

**STATE of Louisiana**

v.

**Louis E. BAGNERIS et al.**

No. 44403.

March 23, 1959.

Jack P. F. Gremillion, Atty. Gen., M. E. Culligan, Asst. Atty. Gen., Richard A. Dowling, Dist. Atty., Edward A. M. Estalote, Asst. Dist. Atty., New Orleans, for appellant.

Clem H. Sehrt, Edward J. Boyle, Virgil M. Wheeler, Jr., Louis C. Lacour, I. O. Johannesen, Sam Monk Zelden, Max Zelden, Frank Shea, Guy Johnson, Bentley G. Byrnes, Edward A. Wallace, Edward A. Generelly, George J. Gulotta, Chandler C. Luzenberg, Jr., Nestor F. Mills, George W. Reese, Jr., New Orleans, Allen J. Tillery, Arabi, Anthony J. Vesich, Jr., New Orleans, for appellees.

SIMON, Justice.

In this case, Louis Bagneris and twenty-eight other persons are here charged in one bill of indictment returned by the Grand Jury on February 12, 1958, with the crime of conspiracy to commit public bribery as denounced by LSA–R.S. 14:26 [1]. It

---

1. "Criminal conspiracy is the agreement or combination of two or more persons for the specific purpose of committing any crime; provided that an agreement or combination to commit a crime shall not amount to a criminal conspiracy unless, in addition to such agreement or combination, one or more of such parties does an act in furtherance of the object of the agreement or combination.

"Where the intended basic crime has been consummated the conspirators may be tried for either the conspiracy or the completed offense, and a conviction for one shall not bar a prosecution for the other. * * * *"

cannot be disputed that these defendants are identified and classified as members of the New Orleans Police Department, known gamblers, and intermediaries serving between these two groups.

The offense of criminal conspiracy to commit public bribery is alleged to have occurred between January 1, 1949 and June 30, 1955, and the indictment, however, negatived prescription by setting out *"* * * that although more than one year has elapsed since the commission of the aforesaid in manner and form as aforesaid, yet one year has not elapsed since the commission of the aforesaid offense was made known to the Judge, District Attorney, or Grand Jury having jurisdiction thereof * * *."

Following the return of this indictment, the defendants filed various pleadings, including a plea to the effect that the indictment was insufficient in that it fails to allege an overt act. Thereafter, on August 16, 1958, the present District Attorney, who had in the meantime succeeded his predecessor, amended the indictment by alleging in substance that between January 1, 1949 and June 30, 1955, a plot or conspiracy existed between the defendants to violate the gambling laws of this State,[2] wherein

the defendants who were engaged in gambling as a business deposited bribe money with certain intermediaries where it was collected by the defendants who were members of the New Orleans Police Department as an inducement to the latter to permit the continuing of the illegal business of gambling unmolested. Prescription was again negated.

It is interesting to observe that this amendment was made by the present District Attorney to cure the failure of alleging an overt act in the indictment returned during the administration of the former District Attorney; that though it is alleged therein that the "Grand Jury" would negative prescription, as was done, the Grand Jury which had returned the basic indictment was no longer in existence at the time the indictment was amended. It may be successfully contended that the nonexistent Grand Jury did not and could not have charged an overt act, as required by law, nor negate prescription. However, this abstract problem is pretermitted without affecting the ultimate decision reached by us.

In addition to the motions to quash and the filing of demurrers, all of the defendants filed pleas of prescription of one year under LSA–R.S. 15:8[3] which provides

2. As denounced by LSA–R.S. 14:90.
3. "No person shall be prosecuted, tried or punished for any offense, murder, aggravated rape, aggravated kidnapping, aggravated arson, aggravated burglary, armed robbery, and treason excepted, unless the indictment, information, or affidavit for the same be found or filed within one year after the offense shall have been made known to the judge, district attorney or grand jury having jurisdiction; * * *."

that a prosecution for any crime, excepting a few named crimes, but including the crime of conspiracy to commit public bribery, shall be barred by prescription unless the indictment or bill of information is filed within a year after the offense shall have been made known to the judge, district attorney or Grand Jury having jurisdiction. The learned Judge of the Criminal District Court, Section "B", after hearing the evidence and analyzing all documentary proof, in an able and painstaking written opinion, maintained the pleas of prescription and ordered all defendants discharged, to which the District Attorney reserved a bill of exception, and which is styled Bill of Exception No. 1, making the entire record part of the bill. Thereafter the State asked for a rehearing, which was denied, and to which ruling Bill of Exception No. 2 was reserved. The State then appealed.

█ The State necessarily concedes that if the evidence, oral and documentary, contained in the record on the hearing of the plea of prescription constitutes in law "a making known to the Judge, District Attorney or Grand Jury having jurisdiction" of the commission by the defendants of the offense charged, the plea was properly sustained by the trial judge, since more than one year elapsed between the dates wherein the crime is alleged to have been committed, January 1, 1949, to June 30, 1955, and

the date when the indictment was returned, February 12, 1958. But it is contended by the State that whoever invokes the plea of prescription has the burden of proof, and that if there exists any doubt as to the validity of the plea or as to the proof offered, or has not been sustained by sufficient evidence, the plea must be rejected and the motion denied. In that connection the State argues that the defendants have utterly failed to offer any evidence in support of their plea; that, while it is true that the District Attorney and his assistants, three investigating Grand Juries, and certain judges, the latter having presided in the trial of various cases of public bribery involving some of the defendants here, and the report of the "Special Citizens Investigating Committee", fully imparted knowledge that a system of graft and bribery existed between known gamblers, their intermediaries and certain members of the police department of the city; that though various individual and parallel acts of bribery were well known since the early part of the year 1954, the knowledge of a concerted and combined effort or agreement of the defendants did not come to the attention of the named officials until September, 1957, less than six months before the indictment was filed. It is further contended by the State that conspiracy to commit public bribery is a distinct and separate crime from bribery, and in that respect we are in full accord.

■ We readily recognize that the onus is not on the State to prove the negative, but that the burden of establishing the affirmative, i. e., that knowledge of the offense had been brought to a competent officer more than one year previous to the filing of the indictment or information rests upon the defendants. State v. Barrow, 31 La.Ann. 691; State v. Barfield, 36 La.Ann. 89; State v. Posey, 157 La. 55, 101 So. 869; State v. Perkins, 181 La. 997, 160 So. 789; State v. Guillot, 200 La. 935, 9 So. 2d 235.

■ Therefore the sole issue presented can be summed up by an answer to the question: Have the defendants successfully shown that the *offense* was made known to the Judge, District Attorney or Grand Jury more than a year before the indictment was presented? This presents primarily a question of fact.

■■ The word "offense" may be and is frequently used interchangeably with the word "crime". In its legal signification it means a transgression of a law for which punishment may be inflicted. This is the sense in which it is used in LSA–R.S. 15:8, supra.

The meaning of the word "knowledge" being synonymous with · the words "made known" was exhaustively analyzed by this Court in State v. Perkins, supra [181 La. 997, 160 So. 791], wherein we said:

"The meaning of the word 'knowledge' is to be largely determined by the connection in which it is used. Its extent is not always the same when used in connection with different statutes relating to different subjects. In a legal sense, knowledge may be positive or imputed. While knowledge is to be distinguished from belief, information, and suspicion, the means of knowledge may be equivalent to knowledge. Knowledge may mean that which is gained by information or intelligence as well as what is obtained from personal observation. The term may include that which is imputed and may be used as synonymous with notice of such circumstances as ordinarily, upon investigation, would lead in the exercise of reasonable diligence to a knowledge of the fact. One who intentionally remains ignorant may be chargeable in law with knowledge. And while notice is. not actual knowledge, it may be such information as men . usually act upon in ordinary human affairs. In this sense, knowledge is such actual notice as would put one upon inquiry. See Corpus Juris, vol. 35, p. 919."

In determining the adequacy of the. evidence on the merits of the plea, we find that the trial judge, in his written reasons for judgment, has correctly epitomized the oral

and documentary proof, and from which we approvingly quote:

"The State alleges in said indictment that, in furtherance of said conspiracy, that the said defendants who were engaged in gambling as a business, directly and through agents, did deposit at certain agreed places, in the City of New Orleans, and with certain designated person or persons, which persons were agents of and acting for the defendant conspirators, police officers, of the City of New Orleans, bribes to have said defendant police officers refrain from enforcing the laws of Louisiana * * *.

"First to examine whether or not the essential elements of the offense hereinabove noted have been made known to the Judges of the Criminal District Court for the Parish of Orleans * * * are some of the defendants gamblers? In simple reply thereto, the records of this Court reveal at least ten of the named defendants have been charged and tried for various gambling offenses in the jurisdiction for alleged crimes extending back many years.

"Now as to whether or not certain agreed places of deposit for these alleged bribes were made known to the Judges of proper jurisdiction. The Court need only recall the cases of: State of Louisiana v. Edwin H. Sbisa, 232 La. 961, 95 So.2d 619; State of Louisiana v. Aaron Harris, Section F.

State of Louisiana v. Adolph A. Mayhafer, No. 153-025, Section B. All of the

above cases were tried in the Criminal District Court for the Parish of Orleans more than a year prior to the return of the present indictment. Both Sbisa and Harris, the defendants in the above cases, are also defendants in this proceeding.

"The records of these cases reveal that the defendant police officers were charged with malfeasance in office for failure to arrest other members of the department who were regularly collecting bribery within their respective districts. All three of these trials included the testimony of John Bray and Philip F. Frichter to the effect that one of the places where the gamblers would deposit bribe money was at the G & G Bar operated by George Pecorara. Thus the overt act of the amended indictment * * * the depositing of bribes at 'certain places' seems to have been well proven in the courts of this jurisdiction more than a year before the present indictment was returned. Now the very testimony of Bray and Frichter in the Sbisa and Harris cases appears to have been the basis for recharging them with another crime, for Harris and Sbisa are now charged with the other conspirators, including Pecorara, who was identified as the operator of the G & G depository for bribes. This Court in the light of this evidence cannot understand how anyone can contend that the evidence of a conspiracy was not disclosed by this open Court testimony.

"To strengthen this most positive conviction is the additional testimony of Bray and Frichter in the Harris, Sbisa and Mayhafer cases to the effect that from 1951 up to June 30, 1955, there existed a system of graft in the New Orleans Police Department. That it was a part of this larger system of graft, that the gamblers would deposit at certain locations in the City of New Orleans, certain fixed amounts of money, which were picked up by members of the New Orleans Police Department, and distributed to the members of the New Orleans Police Department. That the purpose of this pay-off was to have the members of the New Orleans Police Department refrain from enforcing the laws against the Handbook Operators and the Lottery companies, and to allow them to operate without Police interference.

"To consider whether or not knowledge of this alleged conspiracy reached the District Attorney for the Parish of Orleans more than one year prior to the return of the indictment here considered, one only need refer to the testimony of Mr. Leon D. Hubert, former District Attorney, on the hearing held on the accused plea of prescription, he in substance stated:

"a) That on May 3, 1954, he assumed the official duties of responsibilities of the District Attorney for the Parish of Orleans; that prior thereto, from approximately April, 1953, to October, 1953, he was Chairman of the Special Citizens Investigating Committee;

"b) That the function and purpose of the SCIC, as set out in a Municipal Ordinance, essentially concerned an investigation into alleged irregularities purportedly existing in the New Orleans Police Department and specifically included the investigation of alleged public bribery purportedly committed by members of that department;

"c) That a report, consisting of six volumes styled 'Report of the Special Citizens Investigating Committee', was prepared, and made available not only to the District Attorney's Office on or about May 4, 1954, but was also presented to the Orleans Parish Grand Juries convened for the terms from March, 1954, to September, 1954 (the Hartson Grand Jury) and from September, 1954, to March, 1955, (the Kehoe Grand Jury);

"d) That he and three Assistant District Attorneys familiarized themselves with said SCIC Report and studied it page by page, paragraph by paragraph, and line by line;

"e) That prior to February 1, 1955, he advised the then Commissioners Cassibry and Fitzmorris, members of the Police Commission of the City of New Orleans, that there were certain leads in the SCIC Report that should have been followed up, but that he (District Attorney Hubert) didn't have the manpower to do it.

"f) That he studiously and diligently, to the limit of his ability, investigated police bribery in the New Orleans Police Department and the so-called system of bribery alleged to have been existing in the New Orleans Police Department and submitted his findings to at least four separate grand juries, duly empaneled for the Parish of Orleans, during his term of office in the years 1954, 1955, and 1956.

"g) That he followed up all leads and subpoenaed all witnesses that he thought necessary before the various grand juries.

"An examination of the SCIC Report (Exhibit D–1) and the P. B. I. references (Exhibit D–2) disclose that all the defendants named in this indictment were mentioned or referred to therein on numerous occasions regarding public bribery, police bribery and systematic graft, etc.

"Hence, we have the situation in which defendants are alleged to have committed crimes of public bribery alone and in concert with others and same are made known to the District Attorney and various Orleans Parish Grand Juries more than one year prior to the date of the filing of the instant Bill of Indictment. The Sbisa case in the Supreme Court of Louisiana, 232 La. 961, 95 So.2d 619, contains ample authority, if any be needed, to the effect that the SCIC Report could be considered notice to the District Attorney for the Parish of Orleans of the matters therein reported.

"The following excerpt from the testimony of Mr. Hubert is considered sufficient, in itself to determine the issues of this case:

"A.) I was District Attorney for the Parish of Orleans, from May 3, 1954, to May 5, 1958.

"Q.) As District Attorney you were in charge of the District Attorney's Office and legal advisor to the Grand Jury who brought this indictment on February 12, 1958.

"A.) That is correct.

"Q.) When, if you know of your own knowledge, when did you first learn that a conspiracy existed in that indictment?

"A.) The key evidence as I saw it first came to my attention in the summer of 1957, I got it through Jack Nelson who was an Assistant District Attorney, and in charge at the time.

"Q.) When did you learn of a conspiracy, when?

"A.) To me, the key to what I understand this conspiracy to be, and I don't think there was a case prior to that time, the key evidence came to my attention in the summer of 1957.

"By Mr. Becker:

"Q.) When you say the key came to you in the summer of 1957, explain to the Court what you mean by the key?

"A.) There were two or three witnesses, the testimony came to my attention that I didn't know anything about until that time, and that testimony was the key to the whole thing.

"Q.) Did you know of the testimony of Officer John Bray in 1955?

"A.) Yes sir.

"Q.) Didn't you know of the testimony of Officer Frichter in 1955?

"A.) I believe that is correct, I knew the testimony of Bray and Frichter more than a year before this indictment came up but when you ask of 1955 I am not too sure.

"Q.) Didn't you personally try the Sbisa case?

"A.) I did.

"Q.) Didn't you personally try the Harris case?

"A.) I did.

"Q.) Didn't you try the Mayhafer case?

"A.) I did.

"Q.) Didn't Officer Bray testify in all three cases?

"A.) He did.

"Thus, it is apparent that Mr. Hubert had heard the details of the graft system, or conspiracy, in open court on these occasions, more than one year prior to the indictment, Mr. Hubert did not learn of this conspiracy six months prior to the indictment, what Mr. Hubert did learn at this time was no new offense but merely the existence of certain 'Key Witnesses'. This cannot alter the inescapable conclusion that the *offense* described by this indictment was known to many Judges, Grand Juries and District Attorneys for some time in excess of a year prior to the return of this indictment."

In State v. Hayes, 161 La. 963, 109 So. 778, 779, an officer authorized to institute a prosecution having been *advised* with respect to the commission of a crime, this Court, in holding that the plea of prescription was well founded, said:

"It was not required to show that the officer knew of the details of the shooting, or that the facts involved criminal liability, and would sustain a charge against the party who was supposed to have committed the unlawful act."

In State v. Cooley, 176 La. 448, 146 So. 19, it was held that the prescription prescribed by Article 8 of the Code of Criminal Procedure, now LSA–R.S. 15:8, is not affected by the nonaction of the official, or official body authorized to prosecute, no matter what the official's reason may be for his or their nonaction. The Court said that the fact that the District Attorney possessed knowledge of the facts, but refused to give credence thereto, and for that reason made no investigation to ascertain their

truth or falsity, or to prosecute until a subsequent report justified in his own mind a prosecution, was insufficient to defeat the plea of prescription.

In State v. Perkins, supra [181 La. 997, 160 So. 791], the defendant was charged with the crime of bigamy. The facts are that the wife of the defendant complained to the District Attorney's Office, and it was argued by the State that this mere complaint was not "knowledge" placing that office in a position to prove the crime of bigamy. Conceding this to be true we held that such a circumstance does not take the case out of the rule prescribed and went on to say:

"To say the least, the information that was in the possession of the district attorney was sufficient to place him on notice that defendant had committed the crime of bigamy, and to suggest that a prompt and full inquiry be had as to the facts. There is no reason to suppose, in the exercise of due diligence, he could not have discovered within the year prescribed by the codal article that, as it subsequently developed, defendant's first wife was living undivorced from defendant at the time he contracted his second marriage. Hence, it is immaterial whether the facts furnished the district attorney be referred to as notice or as knowledge. The effect produced was the same in either case. The notice the district attorney received of defendant's commission of the offense of bigamy was equivalent to the knowledge on his part that defendant had committed the crime."

In State v. Young, 194 La. 1061, 195 So. 539, 540, we said:

"Within the meaning of the Code, a crime or offense is made known to an officer 'having jurisdiction' when the facts which come to his knowledge are such as to indicate to him that it is his official duty to act or to see that an investigation of the alleged crime is instituted within his jurisdiction."

In State v. Oliver, 196 La. 659, 199 So. 793, 795, this Court in conceding that the district attorney and members of the police jury testified that they had no actual knowledge other than general complaints of a misappropriation or embezzlement until they had subsequently received new and additional information sufficient in their opinion to authorize prosecution, we observe that the slightest and perfunctory observation or investigation would have revealed the true situation, and in concluding that the plea of prescription was well taken, we said:

"The question before the Court is not whether the district attorney had actual knowledge of the embezzlement of the funds by the defendant and Dar-

deau, but whether or not he had notice or such knowledge or information of the transaction as to put him upon inquiry."

We further said:

"* * * it is our opinion that the district attorney and the members of the police jury had sufficient knowledge of the facts of the transaction before June of 1938 to have placed them upon inquiry and investigation in order to ascertain what had become of the proceeds of the check and at that time or even before then to have demanded and exacted an accounting of the funds or the prompt prosecution of Oliver for the embezzlement thereof.

"The Legislature, as a matter of public policy in this State, has prohibited delayed prosecutions for this type of crime by providing that the indictment or information shall 'be filed within one year after the offense shall have been made known to the judge, district attorney or Grand Jury having jurisdiction * * *.' The obvious purpose of this law was to require the prompt filing of criminal prosecutions and to eliminate the fear by persons of the threat of prosecution by public officials charged with that duty, more than one year after the offense had been made

known to them. If the officer charged with the duty of instituting the prosecution is permitted to negative prescription by merely stating he did not have actual knowledge of the commission of the offense, such a holding would, in a large measure and for all practical reasons, nullify the effect of this law."

State v. Brocato, 205 La. 1019, 18 So.2d 602, 604, presented the receipt by the District Attorney's Office of knowledge concerning the possible commission of a crime. The reason for not taking action is that that officer "did not consider the evidence sufficient to justify an investigation." In affirming the ruling of the trial judge sustaining the plea of prescription we observed that the information imparted to the District Attorney's Office should have put them on inquiry, and that it "could have obtained with little or no trouble all of the information necessary to sustain a prosecution, if any one of them (three assistants) had so desired."

The facts of this case bring it clearly within the principles announced by this Court in the foregoing cases. The impact of all oral and documentary evidence compels the conclusion that the defendants have successfully borne the burden of proving that knowledge of the offense charged in this indictment was made known to Judges, Grand Juries and District Attorneys

more than one year prior to its presentation.

To further detail the evidence contained in the voluminous report of the "Special Citizens Investigating Committee" (containing six volumes), other than has been reviewed by the trial judge and herein quoted, the contents of this report covering existing conditions of systematic graft and public bribery involving certain members of the police department and known gamblers acting through common intermediaries; the details of the publicity with attending editorials given this report by the daily press of this city; the results of inquiries and investigations which were conducted by at least three successive Grand Juries; the testimony of the many witnesses called by the State in the prosecution of the Sbisa, Harris and Mayhafer cases, supra, would be to thresh over the obvious, or as it may be said, "to gild the lily". Hence, it is our opinion that in the light of these facts and circumstances so glaringly exposed, aside from personal observation, that one or more of the officers named in the Statute, supra, had sufficient knowledge to have placed them upon inquiry and investigation, and to thus conclude, within the year prescribed, as it subsequently developed, that these defendants were accountable to the offense now sought to be prosecuted.

We may rightly assume that the officer charged with the duty of prosecuting may have had his mind fixed on prosecution for the crime of bribery rather than a prosecution for the concerted and conspiring efforts by individuals in the system of public graft. Public bribery is an offense which requires the concerted action of at least two persons, and equally obvious is the axiom that whenever two or more persons combine and act in concert to violate the law, they are equally accountable as conspirators under the Statute, supra.

In the expression herein set forth we do not say or intimate upon whom the responsibility of the failure to prosecute during these many years shall be assessed. However, we subscribe to and endorse the statement of the trial judge that "it seems only proper to note that the present District Attorney assumed office after this matter prescribed, and that his attempt to sustain this indictment was the valiant effort of an able lawyer, but he could not breathe life into a lifeless prosecution."

For the reasons assigned the judgment appealed from is affirmed.

HAMITER, J., concurs in the decree.

McCALEB, J., concurs in the decree because he feels bound by the cases cited in the opinion but does not agree therewith.